AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No. 2:22-mj-04117-duty |
| GREGORY JAMES and LAMOND AKINS, | |
| Defendants | |

**LODGED**
CLERK, U.S. DISTRICT COURT
10/20/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JP _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
October 20, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 17, 2022, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery |
| 18 U.S.C. § 924(c)(1)(A)(iii) | Discharging a Firearm in Furtherance of a Crime of Violence |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/  Mark Yzabal
_____
*Complainant's signature*

MARK YZABAL, Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  October 20, 2022
_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. ALKA SAGAR, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: JMC x6520

### AFFIDAVIT

I, Mark Yzabal, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of:

a.   a criminal complaint against and arrest warrants for GREGORY JAMES ("JAMES") and LAMOND AKINS ("AKINS") for violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery) and 18 U.S.C. § 924(c)(1)(A)(iii) (Discharging a Firearm in Furtherance of a Crime of Violence); and

b.   an application and warrant to search 550 South Palos Verdes Street, Unit 733, San Pedro, California 90731 (the "SUBJECT PREMISES"), which is believed to be a residence used by JAMES and the location used to meet following the robbery on October 17, 2022.

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery and Conspiracy to Commit Hobbs Act Robbery), and 18 U.S.C. § 924(c) (Brandish or Discharging of a Firearm in Furtherance of a Crime of Violence), as described more fully in Attachment B (the "Subject Offenses").   Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

1

warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Task Force Officer ("TFO") assigned to the Federal Bureau of Investigation ("FBI") Los Angeles Metropolitan Violent Crimes Task Force ("LAMVCTF") and have been a member of the task force since August 2018.  I have been deputized to investigate violations of Title 18 of the United States Code.

5.    I have been employed as a full-time peace officer for the Los Angeles County Sheriff's Department ("LASD") since July of 2000.  I have been an Investigator at Major Crimes Bureau since December 2016 and I am currently assigned to the LASD Metro Detail.  I am responsible for identifying, targeting, and apprehending violent felons, career criminals, repeat offenders, robberies, and high-profile suspects.

6.    I have a wide range of patrol and detective experience investigating crimes against persons and property.  I have performed these duties while assigned as a Detective at South Los Angeles Sheriff's Station.  I have interviewed hundreds of victims, witnesses, and suspects and have investigated their statements as to their veracity.  I am familiar with the way crimes are committed and how suspects attempt to avoid arrest and prosecution.  I have conducted hundreds of surveillances and have authored and served search and arrest warrants for cases I have investigated.

7.    I have testified as an arresting or investigating officer on hundreds of occasions, in Juvenile, Municipal, and Superior Courts throughout Los Angeles County.

8.    In connection with the commercial robbery investigations in which I have participated, I have used a variety of investigative techniques, including interviewing suspects and witnesses, speaking with law enforcement agents and officers, reviewing electronic surveillance, and reviewing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, I am familiar with the methods used by individuals to commit commercial robberies.

### III.  SUMMARY OF PROBABLE CAUSE

9.    LASD, the FBI, and other law enforcement agencies, investigated a series of three related robberies of armored cars.  The armored car robberies series started on or about August 4, 2022 and continued through October 17, 2022.  During each of the robberies, the robbers arrive on the scene and immediately ambush armored car vehicle employees, shooting and wounding them, before stealing money and often the employee's firearm.

10.   Based on information set forth below, law enforcement has identified JAMES and AKINS as two of the suspected robbers. Specifically, JAMES and AKINS were captured together on surveillance camera footage at the building in which the SUBJECT

PREMISES is located just after the most recent October 17, 2022 robbery wearing items of clothing consistent with the clothing worn in the robbery.  AKINS is also the registered owner of a black Chevy Malibu, which is consistent with the vehicle used during the robbery.  Cell phone records for JAMES's cell phone place him in the location of the October 17, 2022 robbery at the time of the robbery.  JAMES and AKINS are also seen returning to the building containing the SUBJECT PREMISES wearing clothing consistent with clothing worn at the October 17, 2022 robbery and at a time consistent with returning to the SUBJECT PREMISES after the robbery.  The SUBJECT PREMISES is a residence used by JAMES, the suspected meeting location used following the robbery, and the location where, as of, October 18, 2022, the Chevy Malibu remained parked.

## IV. STATEMENT OF PROBABLE CAUSE

### A.   The October 17, 2022, Harbor City Armored Car Robbery ("Subject Robbery")

11.   Based on my review of law enforcement reports and surveillance video, I have learned the following:

a.   On October 17, 2022, at approximately 11:20 a.m., a Loomis guard was ambushed by two armed suspects after exchanging money inside of the ATMs at the Bank of America located at 23800 South Vermont Avenue, Harbor City, California 90710.

b.   During the robbery both suspects were armed with

4

semi-automatic handguns.  The two suspects fired several times at the victim guard.

      c.   In the surveillance stills, the first suspect was wearing a dark hooded sweatshirt and dark sweatpants and the second suspect was wearing gray sweatshirt and gray sweatpants.

      d.   During the robbery the guard was struck several times in the right leg by the suspects' gunfire.

      e.   The suspects fled the location in a black Chevrolet sedan with chrome wheels.

      f.   The robbers stole approximately $140,000-$145,000.  In addition, the robbers stole the guard's firearm during the robbery.

12.  I have reviewed video taken from the Loomis armored car that was robbed.[1]  Based on my review of that video, I learned the following:

      a.   The first robber wore a dark hooded sweatshirt, dark sweatpants, a light blue surgical mask, black and white tennis shoes, white socks, black gloves, holding a black semi-automatic handgun.

      i.   Based on the investigation, as described further below, there is probable cause to believe that Robber 1 is JAMES.

      b.   The second robber ("Robber 2") wore a gray hooded sweatshirt with the word "Aeropostale" on the left arm, gray

---

[1] Loomis has a system in which trucks are equipped with video recording systems.

sweatpants with a dark color logo on the upper front left leg area, black socks, white tennis shoes, black glove on right-hand only, and with a black facial mask, and holding a black semi-automatic handgun.

i.   Based on the investigation, as described further below, there is probable cause to believe that Robber 2 is AKINS.

c.   Below are images that from Loomis video of the robbers and of the suspect vehicle, which appears to be a black Chevy Malibu, with the driver side and passenger side doors open:



**B.   Surveillance Video from the Apartment Complex at the SUBJECT PREMISES Shows JAMES and AKINS Wearing Items of Clothing Consistent with the Robbers, Shortly after the Robbery**

13.   On October 19, 2022, I obtained a copy of the video

from the Harborfront Apartment Complex, located at 550 South Palos Verdes Boulevard, San Pedro, California.  This is the apartment complex in which the SUBJECT PREMISES is located.

14.   At approximately 11:30 a.m., that is, 10 minutes after the robbery, a black Chevrolet Malibu, consistent with the vehicle used in the robbery, arrived at the Harborfront Apartment Complex.

15.   Based on security footage, JAMES appears opening the security gate through a motion sensor so that the black Chevrolet Malibu may enter.[2]  Just prior to this, JAMES is seen on security footage, walking through the apartment complex, talking on his cell phone.  As described below, the call detail records, show that JAMES's cell phone was connected to AKINS's cell phone at this time.

16.   Below are some images from that video[3] that depict JAMES and AKINS using the elevator at Harborfront Apartment Complex.  This was approximately 11 minutes after the robbery.

17.   The timing of JAMES and AKINS return to the Harborfront Apartment Complex is consistent with returning to the location following the robbery, based on the distance from the location of the robbery to the Harborfront Apartment

_____

[2] Based on my conversations with the Harborfront Apartment Complex employee, the garage is equipped with a system in which cars that are registered are equipped with a sticker that automatically open the garage.  The black Chevrolet Malibu is not a registered vehicle and thus it appears JAMES needed to use the motion sensor.

[3] The video camera on the elevator has a time stamp that is behind by approximately 1 hour.  Thus, while the time stamp shows 10:31, this is actually 11:31 a.m.  This was confirmed by both the apartment manager and an LASD tech crew.

Complex.

18.  When returning, JAMES is wearing dark sweatpants, black shoes, blue surgical masks worn, and a dark sweater draped over his left shoulder that are consistent with the dark sweatpants, black shoes, blue surgical mask, and dark sweater worn by ROBBER 1 during the robbery.  AKINS is wearing white pants and white shoes consistent with the white pants and white shoes worn by ROBBER 2 during the robbery.

        a.  I recognize JAMES and AKINS based on their body types.  I recognize AKINS's by his face, which is consistent with his booking photograph from June 30, 2022.  In addition, the phone records for both of their registered cell phones place them at the location at that time.

        b.  In addition, when an apartment complex employee[4] helped us pull this video, she identified the individual wearing the white t-shirt as "JAMES" and as G.T.'s (the renter of the SUBJECT PREMISES) "brother."

_____

        [4] The employee's identity is not being disclosed in order to protect the employee's safety.  The employee is in a position at the complex to interact with all of the residents.



### C.   Additional Evidence Tying the Chevrolet Malibu to AKINS at the SUBJECT PREMISES

19.   On October 18, 2022, LASD Detective Steve Fernandez went to the Harborfront Apartment Complex.  Parked in the gated parking lot, Detective Fernandez located a gray SUV Mercedes registered to JAMES.  Parked directly behind that vehicle, with a car cover over it, was the black Chevrolet Malibu.  Detective Fernandez saw the license plate on black Chevrolet Malibu.  The black Chevrolet Malibu is registered to AKINS.

### D.   Cellular phone locations for the SUBJECT ROBBERY

20.   On October 14, 2022, law enforcement obtained a search warrant for telephone number (310) 283-6441 ("JAMES Cell") for call detail records (CDRs) with historical cell site

location information ("HCSLI") and GPS location information.
The search warrant was authorized and signed by the Honorable
Brian F. Gasdia, of the Norwalk Superior Court.  Based on the
CDRs and GPS information I received, I learned the following:

       a.   The phone is subscribed to JAMES.

       b.   On October 17, 2022, between 10:59 a.m. and 11:05
a.m. James Cell connected to a cell tower near the Bank of
America robbery in Harbor City, California.[5]

       c.   GPS records for JAMES Cell places it near the
location of the Bank of America Harbor City robbery between the
hours of 10:22 a.m. and 11:07 a.m.

   21.  On October 17, 2022, I authored a search warrant for
subject telephone (725) 249-9481 ("AKINS Cell") for CDRs with
HCSLI and GPS location information.  The search warrant was
authorized and signed by the Honorable Margaret M. Bernal of the
Norwalk Superior Court.  Based on the CDRs and GPS information I
received, I learned the following:

       a.   The number is subscribed to AKINS.[6]

       b.   On October 17, 2022, at approximately 11:27 a.m.,
-- approximately seven minutes after the robbery -- AKINS Cell
was connected to a cell tower near the SUBJECT PREMISES.[7]  During
this time, this number makes a connection to JAMES Cell.  The

---

[5] JAMES Cell placed two outgoing phone calls to telephone number ending in -9394, which is subscribed to L.R.F.

[6] During a June 30, 2022, arrest, AKINS provided the AKINS Cell number, to Los Angeles Police Department as his contact number according to booking/arrest records.

[7] As set forth above, this is consistent with JAMES and AKINS returning to the Harborfront Apartment Complex after the robbery and JAMES exiting the vehicle to open the garage.

location of the cell tower is consistent with the location where the suspect vehicle (black Chevy Malibu) was located at that time, based on the surveillance video.

c.   On October 17, 2022, AKINS Cell connected to JAMES Cell approximately four times between 11:27 a.m. and 11:29 a.m.

**E.**   **Additional Loomis Armored Car Robberies Under Investigation with Similar Modus Operandi ("MO")**

22.   Based on my review of law enforcement reports and surveillance videos and images, I learned the following regarding two other Loomis armored car robberies that occurred at businesses that Loomis services:

a.   August 4, 2022 – outside Hustler Casino, located at 1000 West Redondo Beach Boulevard, Gardena, California, while making a delivery – "Gardena Robbery."

i.   At approximately 10:00 a.m., two Loomis guards were ambushed by two armed suspects during a cash delivery at the "Hustler Casino" located at 1000 West Redondo Beach Boulevard Gardena, California.  During the robbery, two suspects fired several times at the guards.  One of the guards was struck several times throughout his body by gunfire, suffering serious injuries.  One suspect was armed with a semi-auto handgun and a second suspect was armed with a semiautomatic rifle.  The suspects fled the location in a white Honda Accord. The suspects stole a large sum of cash.  The suspects used several vehicles, including a black Chevrolet Malibu, in a coordinated effort during the robbery.

ii.    G.T., JAMES's "brother" and identified above as the registered renter of the SUBJECT PREMISES, has a phone subscribed to him, ending -2087.  This phone, ending in -2087, received a call from an individual who was utilizing a cell tower near the location of the Gardena Robbery, at the time of the robbery.

iii.    One of the vehicles seen at the Gardena robbery and utilized by the suspects was a black Chevrolet Malibu, consistent with AKINS's vehicle and the vehicle used in the October 17, 2022 armed robbery.

iv.    On August 2, 2022, that is, two days before the Gardena Robbery, in Long Beach, two suspects carjacked a victim at gunpoint.  The two suspects stole a white Honda Accord.  Two days later, at the Gardena Robbery, the suspects utilized a white Honda Accord, as described above.[8]  Law enforcement obtained tower dump data for the area of the carjacking around the time of the carjacking.  JAMES's cell phone, subscribed to him, was utilizing a cell tower near the location of the carjacking around the time of the carjacking.

b.    September 27, 2022 – 7-11, located at 2829 South Figueroa Street, Carson, California (after loading an ATM) – "Carson Robbery."

i.    At approximately 10:30 a.m., two Loomis guards were ambushed by two armed suspects after loading money into the ATM inside of the 7-11, located at 2829 South Figueroa

---

[8] Shortly after the Gardena Robbery, the Gardena Police Department located the stolen white Honda Accord abandoned in the middle of the road.

Street, Carson, California 90745.  During the attempted robbery, the suspects fired several times at the guards.  One of the guards was struck twice in the lower back/buttocks area by the gunfire.  The injured guard suffered serious injury.  One suspect was armed with a semi-automatic handgun and a second suspect was armed with a semi-automatic rifle.  The suspect with the handgun was wearing a gray hooded sweatshirt with a black "Air Jordan" logo in the center, black gloves, light gray sweatpants, white tennis shoes and a black mask covering his mouth.  The suspect, holding the rifle, wore a black hooded sweatshirt, black sweatpants, and black and white tennis shoes. The suspects fled the location in a black Jaguar SUV.  A third suspect, believed to be a female, remained inside of the suspect vehicle during the incident.

   ii. Based on tower dump data, JAMES's phone was utilizing a cell tower near the location of the robbery at the time of the robbery.

  **F.** **Interstate Commerce**

23.  On October 19, 2022, FBI SA Stephen J. May telephonically spoke with John Toneatto, Loomis U.S. Vice President Security/Investigations.  Toneatto stated that Loomis is a global organization.  Loomis operates in forty of the fifty states within the United States.  In addition, Loomis also operates within sixteen countries throughout the world (other than the United States).

  **G.** **Probable Cause to Search the SUBJECT PREMISE**

24.  Law enforcement has identified the SUBJECT PREMISES as

JAMES's residence based on the following:

        a.   On October 19, 2022, I spoke with an apartment complex employee at the SUBJECT PREMISES.  The employee told me that G.T. is listed as the renter of the SUBJECT PREMISES. According to the employee, G.T. has asked repeatedly requested for JAMES to have access to the SUBJECT PREMISES and identified JAMES as his "brother."[9]

        b.   JAMES's Cell, as described above, has been returning several times to the SUBJECT PREMISES, since the robbery on October 17, 2022.[10]  This is consistent with this being a residence he uses.

    25.  Based on my training and experience, and my conversations with senior FBI agents experienced in investigating robberies, I know that persons who commit

---

[9] It is unclear if this is a blood relation or not.

[10] On the morning before the robbery, GPS pings on JAMES Cell indicate that JAMES Cell stayed at the SUBJECT PREMISES. Specifically, GPS pings place JAMES Cell in that area from approximately 3:28 p.m. on October 16, 2022, to 9:52 a.m., on October 17, 2022. On the morning of October 18, 2022, this phone was in Los Angeles (Broadway and Manchester) from 2:36 a.m. to 6:31 a.m., but then returned back to the area of the SUBJECT PREMISES.  On October 18, 2022, JAMES Cell returned back to the area of the SUBJECT PREMISES from 7:00 a.m. to 11:18 a.m. Later that day, JAMES Cell returned back to the area of the SUBJECT PREMISES from 4:50 p.m. to 6:20 p.m.  On the night of October 18, 2022 and continuing to the morning of October 19, 2022, JAMES Cell was in the Hollywood area and then traveled to the Torrance area.  On the day of October 19, 2022, JAMES Cell returned to the area of the SUBJECT PREMISES, left for a time, and then returned.  On night of October 19, 2022, JAMES Cell stayed in Torrance.  On October 20, 2022, from 10:23 a.m. to 10:38 a.m., JAMES Cell returned to the area of the SUBJECT PREMISES.

Thus, it appears that JAMES is staying at a hotel in Torrance and also using the SUBJECT PREMISES.  At this law enforcement is trying to identify the precise room for the hotel.

robberies often store or maintain evidence of their crimes in their homes because those individuals believe it is a safe and secure location under their control, and because the items are easily-accessible.  This can include items that have been stolen, or evidence of involvement, such as clothing worn, or tools used, during the commission of the crime.

26.   In addition, based on my training and experience, I know that individuals involved in criminal conspiracies frequently communicate with each other on digital devices, such as cellular telephones.  Those digital devices may therefore have relevant evidence related to an individual's crime, such as text message communications revealing the planning of such robberies, or future robberies.  Further, individuals involved in robbery conspiracies such as this one, often use digital devices to research target locations, directions to target locations, and potential escape routes.

### V.   TRAINING AND EXPERIENCE IN ARMED ROBBERIES

27.   In my training and experience, I know that individuals involved in criminal conspiracies, such as the one described herein, frequently communicate with each other on digital devices, such as cellular telephone.  Based on my training and experience, such individuals use their cell phones to communicate regarding times they may meet up prior to the robbery, plans for robbery locations to target, and supplies (such as items of clothing or firearms) to be used during the robberies.  Those digital devices may therefore have relevant evidence related to an individual's crimes, such as text message

communications revealing the planning of such robberies, or future robberies.

28.   Co-conspirators may use digital devices to research the location of robberies, discuss with co-conspirators possible locations to target, and discuss meeting locations.   This is especially true here as JAMES and AKINS are suspected to have been the robbers in a series of armored vehicle robberies.   To conduct such robberies, JAMES and AKINS likely need to research locations of the robberies, armored vehicles, stores, or banks. Based on my training and experience, individuals in a robbery series like the one under investigation, frequently use the Internet on a cell phone to search for robbery locations.

29.   In my training and experience, it is likely that JAMES and AKINS possess electronic devices that contain evidence, fruits, and instrumentalities of the subject offenses and that one or more of these devices will be found at the SUBJECT PREMISES.   For example, those who conduct robberies will use cell phones or smart phones for some or all of the following reasons:

a. They will use website mapping programs (i.e. Google or Bing) to see where target banks or store location are located in a specific area;

b. They will search online newspaper articles to read what information is available regarding the robberies;

c. They will search online newspaper articles or websites dedicated to unknown robbery subjects to view the bank security images of the robbery/robber;

d. They will use their phone to:

  i.   Take photos/videos of potential locations they consider targeting.

  ii.   Take photos of the items they have taken from a robbery.

  iii. Take photos of trips or places they have been following a robbery – at times showing an influx of income they normally did not have;

  iv.   They will send text messages to coconspirators and/or associates/friends indicating what (criminal) activities they have been engaged in;

  v.   They will use the mapping application on their phone to get directions to/from a location;

  vi.   They will send communications (including photographs of stolen merchandise) to prospective sources of laundering or cleaning money.

  vii. Communications between the robber and any accomplices, such as a getaway driver.

  b.   In addition, the search of a cell phone can reveal GPS location information including historical location data to show whether the robber's cell phone was located near the robberies around the time of those robberies.

30.  Based on the foregoing, as well as my training, experience and knowledge of this investigation, I also believe that electronic devices, including computers, laptops, tablets, and cellular telephones capable of sending text messages, making telephone calls, and accessing the Internet –– and that were

17

likely used by JAMES and AKINS during the robberies and the planning of the robberies -- will be found at the SUBJECT PREMISES.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

31.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and

specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x

35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

       d.    Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[11]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently

---

     [11] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

            f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

            g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including

the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

    32.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII.  <u>REQUEST FOR NIGHT-TIME SERVICE</u>

    33.  I further request that the Court authorize

investigators, to include other federal and local law enforcement agencies, including but not limited to FBI SWAT and Los Angeles Sheriff's Department Special Enforcement Bureau, to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause exists because of JAMES's involvement in an armed robbery and an armed robbery conspiracy, involving firearms, including the discharge of firearms.  Given the holding set forth in <u>Gooding v. United States</u>, 416 U.S. 430 (1974) that there is no need for the presence of exigent circumstances in narcotics [I'm not sure what to do with this] cases to justify a nighttime search, I believe that nighttime service is warranted in this case.

## VIII.    CONCLUSION

34.  For all the reasons described above, there is probable cause to believe that JAMES and AKINS have committed a violation of 18 U.S.C. § 1951(a) (Hobbs Act Robbery) and 18 U.S.C. § 924(c)(1)(A)(iii) (Discharging a Firearm in Furtherance of a Crime of Violence) their roles in the October 17, 2022 Harbor City, California Armored Car robbery.  In addition, for all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. § 1951(a) (Conspiracy to Interfere with Commerce by Robbery); 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery); and 18 U.S.C. § 924(c) (Discharging a Firearm in Furtherance of a Crime of Violence), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this Affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __20th__ day of
_October 2022_ ~~2020~~.

_____
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR

_____
~~Mark Yzabal - Task Force~~
~~Officer~~

_____

25

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises to be searched is the residence located 550 South Palos Verdes Street, Unit 733, San Pedro, California 90731 (the "SUBJECT PREMISE").  The SUBJECT PREMISES is located in the Harborfront apartment complex.  Unit 733 is located on the seventh floor of the complex.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1951 (Conspiracy to Interfere with Commerce by Robbery); 18 U.S.C. § 1951 (Interference with Commerce by Robbery); and 18 U.S.C. § 924(c) (Discharging a Firearm in Furtherance of a Crime of Violence) (collectively, the "Subject Offenses"), namely:

 a.  Any firearm or ammunition;

 b.  Any United States currency in the amount greater than $1,000.

 c.  Masks, gloves, hooded sweatshirts, or clothing items seen on the videos worn during the robberies, including the black Loomis money/courier bag, receipts or records related to the purchase of any of those items;

 d.  All communications regarding a robbery or planning a robbery, including communications related to planning the robbery, selling stolen merchandise, or distributing the proceeds of the robbery;

 e.  Any internet search history showing research for potential robbery locations or armored car carrier companies'

 f.  Any receipts of expenditures over $100 from July 1, 2022 through October 20, 2022;

 g.  Any evidence regarding that may reveal the location of JAMES and/or AKINS on any day between July 1, 2022 and October 20, 2022;

i

h.   Any GPS location data from July 1, 2022 through October 2022;

i.   Cellular/mobile telephones and any forensic copies thereof used to facilitate the SUBJECT OFFENSES;

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

ii

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.